CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
SEP 28 2006
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JERITH T. SCOTT, | ) | |
| Plaintiff, | ) | Civil Action No. 7:05CV00310 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| R. FLEMING, et al., | ) | By: Hon. Glen E. Conrad |
| Defendants. | ) | United States District Judge |

Jerith T. Scott, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 against fifteen employees of Red Onion State Prison. The case is presently before the court on the defendants' motions for summary judgment. For the reasons set forth below, the institutional defendants'[1] motions for summary judgment will be granted in part and denied in part, and the court will grant the motion for summary judgment filed by Nurse T. Phipps.

## Background

Scott's complaint was originally filed on May 20, 2005. In his first claim, Scott alleges that Day, Thacker, R. Phipps, L. Fleming, Kendrick, Boyd, and Berg used excessive force against him on June 6, 2004. In his second claim, Scott alleges that McCoy, D. Fleming, S. Fleming, Boyd, Berg, and Mullins failed to protect him from the use of excessive force. In his third claim, Scott alleges that Braxton, Armentrout, and R. Fleming, are subject to supervisory liability for the use of excessive force. In his final claim, Scott alleges that Nurse Phipps acted with deliberate indifference to his serious medical needs after he was assaulted by the correctional officers.[2]

---

[1] The institutional defendants are as follows: R. Fleming, D. Braxton, J. Armentrout, K. McCoy, L. Fleming, D. Fleming, G. Kendrick, S. Day, R. Phipps, R. Boyd, B. Berg, M. Thacker, S. Fleming, and J. Mullins.

[2] To facilitate analysis, the court has renumbered Scott's claims.

All of the defendants have filed motions for summary judgment. The court issued Roseboro notices to Scott following the filing of the defendants' motions. Since Scott has now responded to each of the motions for summary judgment, the motions are ripe for disposition.

**Standard of Review**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

**Discussion**

1.  Excessive Force

To support his excessive force claim, Scott provides the following summary of events in his verified complaint. Scott alleges that after he broke the sprinkler head in his cell, McCoy directed him to present himself to be handcuffed, and told him that "they were going to beat [his] ass." Scott subsequently refused to be handcuffed, because he felt threatened by McCoy's statement. As a result, Kendrick sprayed pepper spray in Scott's cell. A few minutes later, members of the prison extraction team, including Day, Thacker, R. Phipps, Boyd, and Berg, entered Scott's cell and began hitting Scott in his face and head. Scott alleges that he was then placed in full restraints. Even though Scott allegedly provided no resistance, Day, Thacker, and R. Phipps continued to punch and kick him in the face, head, and "body area," while Boyd and Berg held Scott's head. At some point,

2

Kendrick and L. Fleming entered Scott's cell, and they too began punching and kicking Scott. Scott contends that when he begged the officers to stop assaulting him, they laughed at him, threatened to kill him, and made racially derogatory remarks.

As a result of the attack, Scott alleges that his lips were lacerated, that his eyes were practically swollen shut, that his nose was swollen and felt broken, and that several of his teeth were chipped. Scott further alleges that he sustained knots, bruises, and cuts to his head, that he lost a considerable amount of blood through his nose, and that he was in excruciating pain. Scott contends that his eyes and nose remained swollen for three months, and that he suffered severe headaches during that period. Scott also contends that his vision is now impaired as a result of the incident. Scott's account of the incident and his resulting injuries is supported somewhat by affidavits from fellow inmates.

In response to Scott's allegations of excessive force, the institutional defendants have provided a different version of events. The institutional defendants allege that after prison employees noticed water leaking from Scott's cell, McCoy directed Scott to back up to his cell door and place his hands through the tray slot so that he could be restrained and removed from the cell. Scott refused to comply with McCoy's orders and became verbally disruptive, declaring "this is war." Despite being threatened with pepper spray, Scott refused to present himself to be restrained. Therefore, pepper spray was administered, and the prison extraction team entered Scott's cell to forcibly remove him. The institutional defendants contend that Scott fought with the members of the extraction team and succeeded in assaulting R. Phipps and Thacker. Specifically, Scott struck Phipps and broke the face shield off of his helmet. Scott also grabbed and squeezed Thacker's inner thigh. The institutional defendants note that Scott was charged with four disciplinary violations as a result of his disruptive behavior, including two counts of aggravated assault upon non-inmates.

3

The institutional defendants also argue that Scott's version of the events is unsupported by the medical records that were submitted with his complaint. The medical records indicate that Nurse Phipps was called to check on Scott shortly after he was extracted from his cell. After Nurse Phipps examined Scott's restraints to ensure that they were not too tight, Scott refused further medical assessment. Nurse Phipps noted that her visual observation of Scott's face revealed a dark area of discoloration on the left side of Scott's forehead, and a scant amount of blood draining from his nose. That same day, Scott was examined by Nurse R. Moorefield. Moorefield noted that the left side of Scott's forehead was still discolored, but that there was no active bleeding or drainage from Scott's nose. Scott was examined again on June 7, 2004 after he complained of having nosebleeds and breathing difficulties. The examination notes indicate that Scott had a bruise under his left eye, and that his left eye and nose were swollen. However, no blood was observed, and his airway was not closed. On June 9, 2004, Scott was examined by Dr. Greene for complaints regarding his nose and left eye. Dr. Greene noted that both areas contained contusions, but that there was no obvious displacement with respect to Scott's nose. Subsequent x-rays of Scott's nose revealed that it was not broken. Scott was examined by the prison's contract optometrist, Dr. Charles Owens, on June 17, 2004 for complaints regarding his left eye. Dr. Owens noted that Scott's eye was bruised. On September 9, 2004, Dr. Owens determined that Scott suffers from myopia or nearsightedness. Dr. Owens' examination notes indicate that he prescribed eyeglasses at Scott's request.

In response to the institutional defendants' motions for summary judgment, Scott acknowledges that the extraction team had the right to remove him from his cell after he broke the sprinkler head and refused to submit to restraints. However, Scott argues that the extraction team did not have the right to assault him after he was placed in handcuffs and shackles. Scott contends

4

that he was punched and kicked multiple times while he was restrained, and he denies having assaulted any of the correctional officers. Scott emphasizes that the correctional officers injured his eye and nose, and that they caused serious cuts and bruises. Additionally, Scott insists that he did not request eyeglasses, and that an optometrist would not prescribe eyeglasses if a patient did not need them.

Scott also argues that the injuries to his face can be seen on the videotape submitted in support of Nurse Phipps' motion for summary judgment. The referenced videotape, which has been reviewed by the court, contains footage that was recorded when Nurse Phipps was called to examine Scott. Although Scott's face is shown for only a short portion of the video, it appears that Scott had a large knot on the left side of his forehead, a bruised and/or swollen area beneath his left eye, and blood draining from his nose.

It is well established that the use of excessive force upon an inmate by prison officials violates the Eighth Amendment's prohibition against cruel and unusual punishment. See Hudson v. McMillian, 503 U.S. 1, 5 (1992); Whitley v. Albers, 475 U.S. 312, 319 (1986). To prevail on an excessive force claim, an inmate must show, objectively, that the use of force was contrary to contemporary standards of decency and that he suffered more than de minimis pain or injury. See Hudson, 503 U.S. at 7, 9. He must also satisfy a subjective component by showing that the force was applied "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley, 475 U.S. at 320-321; see also Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

In this case, it is undisputed that Scott broke the sprinkler head in his cell and initially refused to be handcuffed by McCoy. However, according to Scott's version of the events, as provided in his verified complaint, members of the extraction team continuously punched and

5

kicked him even after he was fully restrained in handcuffs and shackles, and even though he was providing no resistence. Construed in the light most favorable to the plaintiff, the court concludes that the plaintiff's allegations create a genuine issue of material fact as to whether the correctional officers used force against him "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley, 475 U.S. at 320-321; Williams, 77 F.3d at 761.

As for the extent of Scott's injuries, he alleges in his verified complaint that he sustained abrasions on his lips, that his eyes were black and practically swollen shut, that his nose was swollen and felt broken, that several of his teeth were chipped, that he lost a considerable amount of blood through his nose, and that he was in excruciating pain. Although Scott's medical records contain no reference to any dental injuries and x-rays revealed that Scott's nose was not actually broken, the records reflect that Scott's left eye and nose were swollen and bruised after the incident, and that his eye was still bruised when he was examined by the optometrist eleven days later. Moreover, as previously stated, the videotape submitted by Nurse Phipps shows a sizeable knot on the left side of Scott's forehead, a bruised and/or swollen area beneath his left eye, and blood draining from his nose. Construing the evidence in the light most favorable to Scott, the court concludes that a genuine issue of material fact exists as to whether Scott suffered more than de minimis injuries.

The institutional defendants also argue that Day, Thacker, R. Phipps, L. Fleming, Kendrick, Boyd, and Berg are entitled to qualified immunity with respect to Scott's excessive force claim. However, government officials are entitled to qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified

6

immunity, the court must "(1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right." Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000).

In this case, the constitutional right at issue is the right to be free from cruel and unusual punishment under the Eighth Amendment. It has been clearly established for some time that the use of excessive force by a prison official violates this constitutional right. See Hudson, 503 U.S. at 5; Whitley, 475 U.S. at 319. Scott has presented evidence that the aforementioned defendants severely assaulted him after he was fully restrained, and even though he was providing no resistance. If Scott's version of the facts is true, a reasonable person in the defendants' positions would have known that their actions violated Scott's right to be free from cruel and unusual punishment. For these reasons, the court concludes that Day, Thacker, R. Phipps, L. Fleming, Kendrick, Boyd, and Berg are not entitled to qualified immunity, and that their motions for summary judgment must be denied with respect to Scott's excessive force claim.

  2. <u>Failure to Protect</u>

In his next claim, Scott alleges that McCoy, D. Fleming, S. Fleming, Boyd, Berg, and Mullins failed to protect him from the use of excessive force. Specifically, Scott alleges in his verified complaint that they stood by and laughed while the other officers assaulted him, and that they failed to intervene.

It is well established that the Eighth Amendment requires prison officials to take reasonable precautions to protect the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 832-833 (1994). To prevail on a failure to protect claim, a plaintiff must show that he was subject to

7

conditions that posed a substantial risk of serious harm, and that prison officials were aware of and disregarded that risk. Id. at 834-837. Construing the evidence in the light most favorable to Scott, the court concludes that there is a genuine issue of material fact as to whether these six defendants knew of and disregarded an excessive risk to Scott's safety. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Additionally, if Scott's version of the facts is true, a reasonable person in the defendants' positions would have known that their actions violated Scott's clearly established constitutional rights. For these reasons, the court concludes that McCoy, D. Fleming, S. Fleming, Boyd, Berg, and Mullins are not entitled to qualified immunity, and that their motions for summary judgment must be denied with respect to this claim.

3. Supervisory Liability

Scott also alleges that R. Fleming, Braxton, and Armentrout are subject to supervisory liability for the use of excessive force. The United States Court of Appeals for the Fourth Circuit has set forth three elements that are necessary to establish supervisory liability under § 1983: (1) that the supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to inmates like the plaintiff; (2) that the supervisors' response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization" of the offensive conduct; and (3) that there was an "affirmative causal link" between the supervisors' inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

In this case, Scott alleges in his complaint that the supervisory officials were aware that correctional officers used excessive force against inmates, that the officials tacitly authorized the use of excessive force, and that his injuries resulted from the officials' inaction. However, Scott's allegations in this regard are merely conclusory. To support their motion for summary

8

judgment, the institutional defendants have submitted an affidavit from D. Braxton. Braxton avers that while he was employed as the Warden at Red Onion, he did not condone the use of force against an inmate unless it was necessary for officers to gain control of a situation. Braxton also avers that he did not allow correctional officers to assault inmates and go unpunished, and that officers within the Virginia Department of Corrections are trained to use force only if their lives are threatened or they are exposed to a serious risk of harm. Additionally, Braxton avers that, to his knowledge, neither J. Armentrout nor R. Fleming permitted the use of force unless it was necessary for officers to regain control of an inmate. Scott has not provided any evidence, in response to Braxton's affidavit, to support his own conclusory allegations. Consequently, the court concludes that Braxton, Armentrout, and R. Fleming are entitled to summary judgment.

4. Deliberate Indifference

In his final claim, Scott alleges that Nurse T. Phipps acted with deliberate indifference to his medical needs after he was assaulted by the correctional officers. It is well settled that a prison official may violate an inmate's Eighth Amendment right to be free from cruel and unusual punishment, if the official shows deliberate indifference to the inmate's serious illness or injury. Estelle v. Gamble, 429 U.S. 97, 102 (1976). The test for deliberate indifference involves both an objective and a subjective component. The alleged deprivation must be, objectively, "sufficiently serious," and the prison official must know of and disregard an excessive risk to the inmate's health or safety. Farmer, 511 U.S. at 834-837.

To support his deliberate indifference claim, Scott specifically alleges that Phipps refused to provide medical treatment after he was assaulted by the officers, that she refused to examine his injuries, that she refused to provide medication, and that she falsified the plaintiff's medical records to indicate that he refused treatment. However, the plaintiff's allegations are directly

9

contradicted by the videotape submitted by Nurse Phipps. As previously stated, the videotape contains footage that was recorded when Nurse Phipps was called to examine Scott. The videotape shows that after the nurse checked Scott's restraints, a correctional officer directed her to examine Scott's face. Another officer then asked Scott if he wanted to have Nurse Phipps look at his face. Because Nurse Phipps is positioned between Scott and the camera, Scott's response is inaudible. However, the first officer can be heard saying, "You're refusing treatment. She's offering you treatment right now." The camera then focuses on Scott's face. At that point, Scott, while shaking his head from left to right, says, "I just want the camera to see. That's all I need." Because the videotape clearly shows that Scott refused medical treatment, the court concludes that Nurse Phipps is entitled to summary judgment.

## Conclusion

For the reasons stated, the court will grant the motion for summary judgment filed by Nurse Phipps. The institutional defendants' motions for summary judgment will be granted in part and denied in part, and the case will proceed as to K. McCoy, L. Fleming, G. Kendrick, S. Day, R. Phipps, R. Boyd, B. Berg, D. Fleming, M. Thacker, S. Fleming, and J. Mullins. Because it appears that none of the parties have made a demand for a jury trial, the case will be referred to United States Magistrate Judge Pamela Meade Sargent, pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge shall conduct such proceedings as she deems appropriate, including an evidentiary hearing, if necessary, and shall submit to the court a report setting forth findings of fact, conclusions of law, and a recommended disposition.

The Clerk is directed to send certified copies of this opinion and the accompanying order

to the plaintiff, counsel of record for the defendants, and Judge Sargent.

ENTER: This 28th day of September, 2006.

/s/ Jack Conrad
United States District Judge