CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 0 2 2007
JOHN F. CORCORAN, CLERK
BY: /s/ J. Clat
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JERITH T. SCOTT, | ) | |
| Plaintiff, | ) | Civil Action No. 7:05cv00310 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WARDEN DAVID BRAXTON, | ) | By: Hon. Glen E. Conrad |
| et al., | ) | United States District Judge |
| Defendants. | ) | |

Jerith T. Scott, a Virginia inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983, seeking monetary damages from fifteen defendants for claims arising out of an incident on June 6, 2004, at Red Onion State Prison ("ROSP").[1] By Memorandum Opinion and Order entered September 28, 2006, the court entered summary judgment in favor of several defendants and dismissed the claims against those defendants. Regarding the merits of plaintiff's remaining claims, the court denied the defendants' motion for summary judgment and referred the case to United States Magistrate Judge Pamela Meade Sargent for appropriate proceedings, pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge held an evidentiary hearing on January 9, 2007. The case is presently before the court for review of the Magistrate Judge's Report and Recommendation, to which defendants have filed objections. For the reasons set forth herein, the court will overrule the objections and will adopt the Magistrate Judge's Report and Recommendation in toto.

### Factual and Procedural Background

Scott's original complaint, filed on May 20, 2005, included four claims. His first claim alleged that S. Day, M. Thacker, R. Phipps, L. Fleming, G. Kendrick, R. Boyd, and B. Berg used

---

[1] Plaintiff is currently housed at Sussex I State Prison in Waverly, Virginia.

excessive force against him on June 6, 2004. In his second claim, he alleged that K. McCoy, D. Fleming, S. Fleming, R. Boyd, B. Berg, and J. Mullins failed to protect him from the use of excessive force. His third claim alleged that D. Braxton, J. Armentrout, and R. Fleming were subject to supervisory liability for the use of excessive force. In plaintiff's fourth and final claim, he alleged that Nurse Phipps acted with deliberate indifference to his serious medical needs after he was assaulted by the correctional officers. On September 28, 2006, defendants' motion for summary judgment was granted in part and denied in part, dismissing the third and fourth claims, and referring the remaining claims to the magistrate judge for appropriate proceedings.

In the first of his two remaining claims, Scott alleged that S. Day, M. Thacker, R. Phipps, L. Fleming, G. Kendrick, R. Boyd, and B. Berg used excessive force against him on June 6, 2004. Specifically, he alleged that, after he broke the sprinkler head in his cell, McCoy directed him to present himself to be handcuffed and said that "they were going to beat [his] ass." Feeling threatened by McCoy's statement, Scott refused to present himself to be handcuffed. As a result, Kendrick sprayed pepper spray into Scott's cell. A few minutes later, members of the prison extraction team, including Day, Thacker, R. Phipps, Boyd, and Berg, entered Scott's cell and, according to Scott, began hitting him about the face and head. Scott was then placed in full restraints. He alleged that after he was restrained, and even though he did not resist, Day, Thacker, and R. Phipps continued to punch and kick him in the face, head, and "body area," while Boyd and Berg held Scott's head. At some point, Kendrick and L. Fleming entered Scott's cell, and they too began punching and kicking Scott. Scott alleged that when he begged the officers to stop assaulting him, they laughed, threatened to kill him, and made racially derogatory remarks.

The crux of Scott's excessive force claim is that members of the extraction team continuously

2

punched and kicked him even after he was fully restrained in handcuffs and shackles, and even after he was no longer providing any resistance to the extraction effort. The court denied defendants' motion for summary judgment, concluding that Scott's allegations created a genuine issue of material fact as to whether the correctional officers had used force against him "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." (Citations omitted.) Additionally, the court found that a genuine issue of material fact existed as to whether Scott had suffered more than de minimis injuries. Regarding the defendants' argument for summary judgment on the grounds that they were entitled to qualified immunity with respect to Scott's excessive force claim, the court determined that Scott had presented evidence that the aforementioned defendants had severely assaulted him after he was fully restrained and not resisting. The court concluded that the defendants were not entitled to qualified immunity because, accepting Scott's version of the facts as true, a reasonable person in defendants' positions would have known that such actions violated Scott's right to be free from cruel and unusual punishment.

In the second of his remaining claims, Scott alleged that McCoy, D. Fleming, S. Fleming, Boyd, Berg, and Mullins failed to protect him from the use of excessive force on June 6, 2004. Specifically, plaintiff alleged that these defendants stood by and laughed while the other officers assaulted him, and that they failed to intervene. Construing the evidence in the light most favorable to Scott, the court concluded that there was a genuine issue of material fact as to whether these six defendants knew of and disregarded an excessive risk to Scott's safety. Additionally, the court denied these six defendants' motion for summary judgment grounded in qualified immunity, concluding that, accepting as true Scott's version of the facts, a reasonable person in the defendants' positions would have known that such actions violated plaintiff's clearly established constitutional

3

rights. The magistrate judge conducted an evidentiary hearing on the excessive force and failure to protect claims, and has now issued a Report and Recommendation, which includes the following proposed findings of fact and conclusions of law:

1. The members of the extraction team – Day, Thacker, Phipps, Boyd, and Berg – used force against Scott on June 6, 2004, but the amount of force used was only that force necessary to subdue, restrain, and remove Scott from his cell.

2. The amount of force used by these officers, therefore, was not excessive.

3. Kendrick and L. Fleming were not members of the extraction team and did not use force against Scott on June 6, 2004.

4. D. Fleming, S. Fleming, and Mullins did not participate in or supervise the extraction of Scott from his cell on June 6, 2004.

5. Because the amount of force used to remove Scott from his cell on June 6, 2004, was not excessive under the circumstances, McCoy, D. Fleming, S. Fleming, Boyd, Berg, and Mullins did not fail to protect Scott from the use of excessive force.

6. D. Fleming, S. Fleming, and Mullins did not participate in or supervise the extraction of Scott from his cell on June 6, 2004.

7. The injuries suffered by Scott in this incident were more than de minimis.

The court will introduce additional facts in its discussion.

## Standard of Review

The magistrate judge makes only a recommendation to this court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The magistrate judge's report has no presumptive weight, and this court retains the responsibility to make a final determination. Id. at 270-271. Consequently, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

4

A district court is only required to review <u>de novo</u> those portions of the report to which specific objections have been made. The court need not conduct a <u>de novo</u> review "when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's report." <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982).

Plaintiff filed no objections to the Magistrate Judge's Report and Recommendation; however, defendants filed two specific objections. First, defendants object to the seventh of the magistrate judge's proposed findings of fact and conclusions of law, where Judge Sargent found that the injuries suffered by Scott were more than <u>de minimis</u>. Second, defendants object to "the finding on page thirteen (13) of the Report and Recommendation where [Judge Sargent] found that the more than <u>de minimis</u> injuries met the objective component of an excessive force claim."

## Discussion

As previously stated, Scott alleged that S. Day, M. Thacker, R. Phipps, L. Fleming, G. Kendrick, R. Boyd, and B. Berg used excessive force against him on June 6, 2004, in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. To prevail on an excessive force claim, an inmate must establish that prison officials acted with a sufficiently culpable state of mind, and that the harm inflicted on the inmate was sufficiently serious. <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996). An inmate "need not show that the force used caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action." <u>Id.</u> (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. <u>See</u> <u>Hudson</u>, 503 U.S. at 9 (citing <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)). Absent the most extraordinary

5

circumstances, an inmate must provide proof of more than de minimis injury. Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994).[2] In other words, the inmate must show, objectively, that the use of force was contrary to contemporary standards of decency and that he suffered more than de minimis pain or injury. See Hudson, 503 U.S. at 7, 9. Inasmuch as some abuses can leave no lasting physical evidence of injury, the courts recognize that "the objective component can be met by 'the pain itself,' even if the inmate suffers no 'enduring injury.'" Williams, 77 F.3d at 762 (quoting Norman, 25 F.3d 1259, 1264 n.4). An inmate must also satisfy a subjective component by showing that the force was applied "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320-21 (1986); see also Williams, 77 F.3d at 761.

At the evidentiary hearing, Scott admitted that he broke the head off of the fire suppression sprinkler in his cell, causing water to stream into the cell and the hallway, and then refused officers' orders to present himself at his cell door so that he could be placed in restraints and removed from the cell. Scott testified that the officer in charge, K. McCoy, told him he was "going to take an ass beating" whether he presented himself or not. Scott testified that he replied, "If you're going to beat me, I'm not going to put my hands behind me." Scott also testified that he covered his face with clothing to avoid the effects of pepper spray that was deployed into his cell and that, when the extraction team entered his cell, he attempted to use a blanket to block the officers' view as they entered his cell and to protect himself from the electrical shock emitted by the electronic

---

[2] In Norman, the United States Court of Appeals for the Fourth Circuit recognized that "there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in the impermissible infliction of pain." Norman, 25 F.3d at 1263. In such circumstances, "the force will be 'of a sort repugnant to the conscience of mankind,' and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury." Id. (quoting Hudson, 503 U.S. at 8).

6

immobilization shield officers use to subdue an inmate. However, Scott maintained that he offered no resistance as the officers attempted to place restraints on him and remove him from the cell. He testified that, despite his lack of resistance, the officers nonetheless took turns administering a beating, which resulted in injuries to his head and face.

According to Scott, one of the officers swung a set of shackles at his head, but missed. He testified that Berg and Boyd held him up so that the other officers could continue to hit him. Scott maintained that he did not grab or punch any of the officers, and stated that he was struck fifteen to twenty times before being placed in restraints and approximately thirty times after being placed in restraints. When he was taken down by officers on to the bed, Scott stated, he stopped resisting, but balled up to protect himself. After being placed in restraints, he testified, the officers continued to strike him, and they kept telling him to stop resisting. He specifically recalled that, after he was placed in restraints, Day, Phipps, Thacker, and Fleming continued to strike him. According to Scott, the result of the beating was that he could not recognize his own face. He testified that his lip was cut, that he suffered other cuts on his eye and head, and that his left eye was so damaged that he became myopic in that eye and required eyeglasses to correct his vision.

The magistrate judge received testimony from four inmates regarding their knowledge of the incident on June 6, 2004. Inmate Mikal Corbett testified that he was housed at ROSP in the cell directly above Scott's and that he witnessed the extraction team in riot gear as it prepared to enter Scott's cell. He stated that the team included Day, Fleming, Thacker, and Kendrick, and that Day led the officers into Scott's cell holding the shield. Corbett stated that he could not see into Scott's cell, but that he heard banging sounds after the extraction team entered Scott's cell and that he heard Scott screaming, "No resisting, I'm not resisting." He testified that he heard officers telling Scott

7

to stop resisting and that, when he saw Scott being removed from the cell, he observed bruising on Scott's face and blood coming from his mouth or nose. Corbett testified that he observed correctional officers laughing and smiling after the incident and that the next time he saw Scott, his face was bruised and remained in that condition for approximately two months.

Inmate Slimaro Grimes testified that he was housed in cell 318 on the upper tier in the A building at ROSP. According to Grimes, he could not see what occurred in Scott's cell when the extraction team entered, but that it sounded as if someone were being struck with shackles or handcuffs. Grimes stated that he heard officers tell Scott to cease resisting and that, after the incident, he saw the officers cheering and giving each other "high fives." According to Grimes, after the incident Scott had a scrape under one of his eyes and his nose was purple and blue.

Inmate Esau Shaw testified that officers brought him in from recreation and returned him to his cell 316 in the A building because of the need to extract Scott from his cell. According to Shaw, Day, Fleming, Phipps, and Thacker entered Scott's cell, took him down to the floor, and then started pushing his head down to the floor. Shaw testified that, after Scott's hands were restrained behind his back, Phipps struck Scott with a set of restraints. Shaw further stated that Day and Phipps lifted Scott after he was placed in restraints and then one of the two officers struck him in the face with a set of restraints. Shaw stated that, as Scott was being led to the shower, his face was bleeding. Shaw testified that, after the incident, officers patted each other on the back and that Scott's left eye was swollen, discolored, and continued to show signs of injury for two to three months.

Inmate Ahoto Mulazim testified that he was housed in cell 306 in the A building at ROSP. Mulazim could not see anything that occurred in Scott's cell after the extraction team's entry, but he stated that he heard screaming while the extraction team was in the cell and that he saw Kendrick

8

run into the cell with his hand balled up. Mulazim stated that he observed blood coming from Scott's mouth when Scott was removed from the cell, that Scott's face was bruised after the accident, and that Scott subsequently started wearing glasses. According to Mulazim, officers cheered after the incident.

The magistrate judge received testimony from eleven officers at ROSP regarding the incident on June 6, 2004, while Captain Kevin McCoy was the Watch Commander in charge at ROSP. McCoy testified that he was called to Scott's cell, where Scott had broken off the sprinkler head and water was flowing from under the door. According to McCoy, he asked Scott to present himself, but Scott refused, ignoring several direct orders to present himself, wrapping items around his face, and stating, "This is war." After fifteen minutes of trying to persuade Scott to present himself, McCoy warned Scott that pepper spray would be discharged into the cell. McCoy asked Scott, "Are you coming out?" to which Scott responded, "No, this is war." McCoy ordered the discharge of pepper spray into Scott's cell. Scott still refused to present himself for placement in restraints, and the extraction team entered the cell.

McCoy described the extraction team as five persons, led by an officer carrying a concave electronic shield, which the lead officer uses to hold the inmate down while the other officers restrain him. McCoy testified that the team that extracted Scott from his cell included Officers Day, Randy Phipps, Randy Boyd, Bryan Berg, and Matt Thacker. McCoy stated that a videotape recording was made of the incident. When the extraction team entered the cell, Scott threw a wet blanket over the shield and began kicking, swinging his arms, and screaming at the officers. According to McCoy, upon Scott's restraint, he was removed to the shower to rinse away the pepper spray, and the extraction took only three to five minutes. McCoy testified that he personally observed the entire

9

incident and did not see any officer strike Scott after he was placed in restraints. Additionally, McCoy testified that Officers S. Fleming, Mullins, and D. Fleming did not participate in the extraction; according to McCoy, S. Fleming and Mullins were removing water from the floor while D. Fleming dealt with the rest of the pod. McCoy further stated that Kendrick administered the discharge of pepper spray into Scott's cell, and that Kendrick and L. Fleming helped supervise the extraction.

Kendrick testified that, earlier on June 6, 2004, Scott had become angry and aggressive when two televisions were found in his cell, in violation of prison policy, and were confiscated. Kendrick stated that he did not participate in the extraction, other than to assist Phipps when his helmet became dislodged and was choking him. Kendrick stated that he did not strike Scott, nor did he see anyone else strike Scott after he was restrained.

Officer Lafayette Fleming stated that he saw water flowing from beneath Scott's door; that Scott had tied some cloth across his face; and that Scott was engaged in suspicious behavior in the back of his cell, moving back and forth between his bed and his toilet, which caused L. Fleming to have concern that Scott possessed a weapon. L. Fleming stated that he did not participate in the extraction, other than to remove the extraction shield when it was discarded and to assist Phipps with the removal of his helmet. L. Fleming testified that he instructed Scott to cease resisting and to stop grabbing the officers, that Scott was removed to the shower once he was placed in restraints, and that he did not strike Scott.

Sergeant Stacy Day testified that, earlier in the day, two televisions had been confiscated from Scott's cell. Prison policy allows inmates to have one television, and Scott was informed that, when it was determined which of the sets he actually had permission for, that set would be returned

10

to him. Day testified that he was called to Scott's cell later in the day to participate in the extraction. Water flowed from beneath the cell door, Scott had wrapped his face with clothing, and he was pacing back and forth. As a member of the extraction team, Day carried the immobilization shield and was the first man to enter Scott's cell. Day testified that his view was blocked when Scott threw a blanket over the shield, and that he dropped the shield, grabbed Scott, and took him down. According to Day, Scott began swinging his fists, and Day began swinging his fists toward Scott. Day testified that he did not know whether the blows he directed toward Scott actually hit Scott, that he physically forced Scott down onto the bed, and that he did what he "could do to get him under control."

Officer Randy Phipps testified that he was the second member of the extraction team to enter the cell and that his assignment was to try to restrain one of Scott's arms. According to Phipps, Scott came toward the extraction team, throwing punches, when the door to the cell was opened. Scott struck Phipps' helmet, breaking an attachment, and then grabbed Phipps' gas mask and pushed it back on Phipps' head. Phipps testified that he threw two punches in Scott's direction, but that he could not see what he hit because of the position of the gas mask. Scott then released his hold on the gas mask. Phipps sought help removing his helmet because the strap made it difficult for him to breathe, and he then grabbed Scott's right arm and forced it behind Scott's back. Phipps took Scott to the shower after he was placed in restraints.

Officer Matthew Thacker testified that he was the third member of the extraction team, and that he was assigned the responsibility of trying to restrain Scott's left leg. Thacker stated that Scott approached the team and threw a blanket over the shield. Then, as Thacker tried to grab Scott's leg, Scott grabbed Thacker in the groin. To break Scott's grip on his groin, Thacker struck Scott.

11

Thacker testified that it took several attempts to restrain Scott's leg and that, during the incident, a hand reached up, grabbing and displacing Phipps' helmet. Thacker stated that he saw no one else strike Scott.

Officer Randy Boyd was the fourth person on the extraction team to enter Scott's cell, and it was his responsibility to place Scott in handcuffs and to place restraints on one of Scott's legs. According to Boyd, Scott began punching and kicking as soon as the team entered the cell, Boyd did not strike Scott or hold him down while the others struck him, and he did not know how Scott's face and head were injured during the incident.

Officer Bryan Berg was the fifth person on the extraction team to enter Scott's cell and was assigned the responsibility of restraining Scott's right leg. Berg stated that Scott punched and kicked at the officers when the team entered the cell, that he was not struck by Scott, that he did not strike Scott, and that he saw no one other than Thacker strike Scott. Berg testified that he saw Scott grab Thacker's thigh, but that Thacker struck Scott's hand once in order to get Scott to release his grasp.

Sergeant Drew Fleming testified that he saw water flowing from beneath the door of Scott's cell and that Scott refused to present himself to be restrained. According to D. Fleming, he was asked to supervise the rest of the building while the extraction took place, that it was his responsibility to prepare an empty cell to which Scott would be removed post-extraction, and that he did not participate in, observe, or supervise the extraction.

Officer Jared Mullins testified that he saw water flowing from beneath Scott's cell door, that he was not a member of the extraction team and never entered Scott's cell, and that he was responsible for the removal of water from the hallway floor with a broom.

Officer Samie Fleming stated that he was working at ROSP on June 6, 2004, but has no

12

recollection of these events. He admitted that a videotape recording of the incident shows him trying to push water out of the area.

The magistrate judge's Report and Recommendation includes the following description of the contents of the videotape of the incident, which was admitted into evidence:

> While the recording does not clearly show everything that occurred while the extraction team was present in Scott's cell, what it does show corroborates the officers' testimony and contradicts Scott's testimony. The recording shows that McCoy ordered Scott to present himself to be restrained on several occasions prior to ordering the extraction team into Scott's cell. Upon the team's entry into the cell, the camera's view of Scott is obstructed by the officers. The recording shows officers' arms moving, but does not clearly show any particular officer striking Scott. It is clear from the recording that a struggle ensued when the officers attempted to subdue Scott and place him in restraints. The recording also establishes that less than three minutes of time elapsed from the time the extraction team entered Scott's cell until he was placed in restraints, removed from the cell, and taken to the shower. The recording further shows that no one struck Scott after he was placed in restraints and brought to his feet. The recording also shows that **Scott did suffer injury to his mouth and around his left eye and that he was bleeding after the incident**. The recording does not show any of the officers celebrating after the incident, although it does show several of the officers, including McCoy, checking on members of the extraction team after the incident.

(Emphasis added.)

Based on the aforementioned evidence, the magistrate judge determined that Scott failed to meet his burden of proof on the excessive force claim. The magistrate judge determined that, although Scott satisfied the objective component of the test for excessive force, he failed to meet his burden of proof on the subjective component. The magistrate judge specifically found "the officers' version of events more credible than the version of events given by Scott." The magistrate judge noted in particular that Officers Kendrick and L. Fleming "did not apply any force to Scott on June 6, 2004," observing that not only had Kendrick and L. Fleming denied using of force against Scott, but that "the videotape evidence showed that these officers were not part of the extraction team and

13

that they entered the cell only to assist Phipps after his helmet became dislodged." Moreover, the magistrate judge found that the officers on the extraction team had used only the "amount of force necessary to subdue, restrain, and remove Scott from his cell," noting that the "uncontroverted evidence" established

> that Scott, himself, created the hazard that required his removal from his cell when he purposefully broke off the sprinkler head in his cell. Scott also created the need to use force to remove him from his cell when he refused orders to present himself to be restrained. While the officers admitted to grabbing and even punching at Scott, each of the officers stated that they grabbed at Scott in an effort to secure his arms and legs in restraints or they punched at him to either protect themselves against his punches or to break his grip on them or their equipment. The entire incident inside of Scott's cell took place in less than three minutes. Furthermore, the videotape evidence does not show anyone striking Scott after he was placed in restraints and brought to his feet, in clear contradiction to Scott's testimony.

Because she found that the force was not excessive, the magistrate judge found further that Scott could not prevail on his failure to protect claim. The magistrate judge further observed that Scott's claims that "Boyd and Berg held him up so that other officers could strike him" failed in the face of the videotape evidence, which "clearly contradicts this version of events." She also specifically found that no evidence indicated that D. Fleming, S. Fleming, or Mullins "either participated in or supervised the extraction of Scott from his cell . . . ."

Defendants have objected to the magistrate judge's finding that Scott suffered more than <u>de minimis</u> injuries. However, based on the court's <u>de novo</u> review of the record, the court agrees with the magistrate judge. As the magistrate judge stated, "[t]he uncontradicted evidence shows that Scott suffered cuts and bruising to his face" and that "the evidence shows that the injuries to Scott's face, especially around his left eye, were so severe that it remained swollen and discolored for several weeks . . . ."

Additionally, defendants have objected to "the finding on page thirteen (13) of the Report

14

and Recommendation that the more than de minimis injuries met the objective component of an excessive force claim." Defendants argue that the magistrate judge "found that the more than de minimis injury automatically meets the objective component of an excessive force claim." However, the court disagrees with defendants' characterization of the Report and Recommendation as finding that Scott's more than de minimis injuries "automatically" met the objective component of an excessive force claim. The magistrate judge wrote, on page 13 of her Report and Recommendation: "**Given the evidence presented at trial**, I first find that the injuries suffered by Scott in this incident meet the objective component of an excessive force claim." (Emphasis added.) The court agrees with the magistrate judge's conclusion. The court's de novo evaluation of "the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose" indicates that Scott's "injury was sufficiently serious in relation to the need for force." Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998). In other words, the injury was "significant enough, **when viewed in its factual context**, to amount to a violation of [Scott's] right to be free from cruel and unusual punishment . . . ." Id. at 636 (emphasis added).

In sum, the magistrate judge's Report and Recommendation does not equate "more than de minimis injury" with "automatic" satisfaction of the objective component of an excessive force claim.[3, 4] Consequently, the court will overrule defendants' objections.

---

[3] The magistrate judge's Report and Recommendation goes on to state, on page fourteen, a finding "that Scott suffered more than de minimis injury as a result of this incident." However, the Report and Recommendation does not state or even imply that the objective component of an excessive force claim is "automatically" met by showing more than de minimis injury. Moreover, it is settled law that, in most cases, an inmate must show, objectively, that the use of force was contrary to contemporary standards of decency and that he suffered more than de minimis pain or injury. See Hudson, 503 U.S. at 7, 9. In other words, objectively showing more than de minimis injury is typically one element of an excessive force claim.

[4] Additionally, the court notes that the magistrate judge found that Scott failed to satisfy the subjective component of an excessive force claim. Based on its de novo review, the court agrees that Scott failed to show that the force was applied "maliciously and sadistically for the purpose of causing harm" and not "in a good

15

## Conclusion

For the reasons stated, the court adopts the findings of fact and conclusions of law proposed by the magistrate judge and overrules defendants' objections. Accordingly, the court will grant judgment in favor of the defendants as to the plaintiff's excessive force claim against S. Day, M. Thacker, R. Phipps, L. Fleming, G. Kendrick, R. Boyd, and B. Berg. Furthermore, the court will grant judgment in favor of the defendants as to the plaintiff's failure to protect claims against K. McCoy, D. Fleming, S. Fleming, R. Boyd, B. Berg, and J. Mullins.

The Clerk is directed to send a certified copy of this opinion and the accompanying order to the plaintiff and to counsel for defendants.

ENTER: This 2d day of May, 2007.

/s/ Jerry Conrad
United States District Judge

---

faith effort to maintain or restore discipline." See Whitley, 475 U.S. at 320; see also Williams, 77 F.3d at 761.